

1  Gerti Muho
   Gerti Muho Capital Management
2  2428 Sacramento Street
   Berkeley, California 94704
3  (212) 480-0001

4  Plaintiff, Pro se

5

6

7

8            IN THE UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  LEVERAGED HAWK, INC. C/O GERTI MUHO      Case No. **CV 13 3469**
    D/B/A GERTI MUHO CAPITAL MANAGEMENT
12                                           **VERIFIED COMPLAINT**
            Plaintiff,
13
                vs.
14
    GLOBAL HAWK, LTD., ALPHONSE FLETCHER,
15  JR., FLETCHER ASSET MANAGEMENT, INC.,
    FLETCHER INTERNATIONAL, INC.,
16  RICHCOURT FUND ADVISORS (SF),
    RICHCOURT USA, INC. CITCO GROUP LTD,
17  CITCO TRADING, INC., CITCO TRUSTEES
    (CAYMAN) LTD, CFS COMPANY LTD., CFS
18  CORPORATION LTD., CTC CORPORATION,
    LTD., SOLON GROUP, INC., CITCO GLOBAL
19  CUSTODY (N.A.) N.V., WILMINGTON TRUST,
    NATIONAL ASSOCIATION.
20
            Defendants,
21
    RICHCOURT CAPITAL MANAGEMENT, INC.,
22  SOUNDVIEW CAPITAL MANAGEMENT, LTD.,
    PITAGORA CAPITAL MANAGEMENT, LTD.,
23  NEW WAVE ASSET MANAGEMENT, LTD.,
    AMERICA ALTERNATIVE INVESTMENTS,
24  INC., ELITE DESIGNATED, NEW WAVE FUND
    SPC, STAR DESIGNATED, OPTIMA
25  ABSOLUTE RETURN FUND LTD., PREMIUM
    DESIGNATED, PITAGORA FUND LTD.,
26  RICHCOURT ALL-WEATHER FUND INC.,
    RICHCOURT ALLWEATHER FUND B INC.,
27  RICHCOURT COMPOSITE INC., RICHOURT
    EURO STRATEGIES, INC., RICHCOURT TOP
28  STARS I FUND LTD, SOUNDVIEW

                              1
        VERIFIED COMPLAINT - CASE NO. _____

KAW

FILED
JUL 25 2013
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  COMPOSITE, SOUNDVIEW ELITE LTD,
   SOUNDVIEW PREMIUM, LTD., SOUNDVIEW
2  STAR LTD.

3       Nominal Defendants.

4

5       1.     Plaintiff, Gerti Muho, as its investment advisor, on behalf of Leveraged Hawk, Inc. ("L-

6  Hawk"), a special purpose vehicle ("SPV") surviving a group of hedge funds listed here as Nominal

7  Defendants, (the "Funds" and, for managing entities, the "Fund Managers"), alleges:

8

9                           SUMMARY OF THE ACTION

10

11      1.     This case is about a ponzi scheme defendants Fletcher Asset Management, Inc. ("FAM")

12  and Citco Trading, Inc. ("Citco") ran on sophisticated creditors for hundreds of millions of dollars over a

    decade and a half.

13      2.     Since the mid-1990's FAM and Citco used SPVs to borrow from financial institutions and

14  invest in private funds. The debt-funded private funds ("DPF") were part of the multi-layered master-

15  feeder family of funds FAM managed and Citco administered. The DPFs generally invested together

16  with other feeder funds into large feeder funds ("LF"). LFs then joined with other LFs to invest in master

17  funds ("MF"). DPFs also loaned money to PFs, LFs, and to MFs. MFs pooled all the funds and made

18  esoteric investments in small public companies (Fig. 1).

19                                    **Figure 1**

20

21

22                                                            

23

24

25      3.     FAM and Citco used overvalued prices for MF's non-marketable assets, and,

26  consequently, for LF assets as a basis to charge excessive management and administrative fees, with

27  FAM receiving 150-200 basis points for every dollar it managed and with Citco paid 50 basis points for

28  every dollar it helped bring into the FAM structure.

                                    2

4. FAM and Citco also used the high valuations to plunder MF's assets. They, alone or jointly, or both, invested with DPFs in cash or, more commonly, in kind, and they redeemed their investments in cash or in kind at high valuations. DPFs overtime were left with shares or notes, or both, of LFs whose share of MF assets had been exhausted almost entirely.

5. In 2010 FAM and Citco, then managers of the Funds, forced the Funds to buy $140,000,000 of worthless assets of DPFs they had pillaged over the years to repay notes Global Hawk, Ltd ("**G-Hawk**"), an SPV, issued to the Royal Bank of Scotland in 2006, which G-Hawk issued to meet obligations Jersey (Corsair), another SPV, had from notes it issued in 2004. FAM and Citco, as managers of the Funds, also forced the Funds to purchase more than $60,000,000 of worthless assets from a PF managed by FAM and administered by Citco.

6. Plaintiff, current manager of the Funds, brings this action for misappropriation of assets of the Funds c/o L-Hawk by FAM, Citco, and other defendants in violation of §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule l0b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder. Plaintiff seeks recovery of misappropriated assets believed to be in excess of $200,000,000 from Citco and FAM defendants. Plaintiff further seeks to void all advisory contracts pursuant to 15 U.S.C. § 80b-15, and all contracts between the Funds and defendants under CA Code §§ 1667 and 1668. Plaintiff further seeks to enforce a contract for the sale of $5,000,000 in preferred shares by L-Hawk to defendants, pursuant to a registered transaction.

### Plaintiffs, Defendants, and Nominal Defendants

2. Gerti Muho is a natural person residing in Berkeley, California, and he is the investment advisor of Leveraged Hawk, Inc., and of all Nominal Defendants as listed in Schedule D of the Investment Advisor Public Disclosure File No. 168066, available freely on the SEC's website. ("**GM**" and, as investment advisor, "**GM Capital**").

3. Leveraged Hawk, Inc. ("**L-Hawk**") is incorporated under the laws of the State of Delaware and is located at Suit 100 at 1679 S. DuPont Hwy. in the city of Dover in the State of Delaware. LHI survives the Nominal Defendant listed on the certificate of merger duly filed with the Secretary of State of LHI's home State of Delaware, pursuant to a merger transaction registered with the

1   SEC, available freely on the SEC website under Filer/Film No's. 021-197351/13886233.

2        4.    Global Hawk, Ltd. ("**G-Hawk**") is an SPV formed in the Cayman Islands, and Citco

3   Trustees (Cayman) Ltd. serves as its sole Director and/or trustee.

4        5.    Alphonse Fletcher ("**F-AF**") is a natural person residing in San Francisco, California.

5        6.    Fletcher Asset Management, Inc. ("**FAM**") is a Delaware corporation managed out of San

6   Francisco, California with its office located in New York, New York.

7        7.    Richcourt USA, Inc. ("**F-RUSA**") is a Delaware corporation managed out of San

8   Francisco, California with its office in New York, New York.

9        8.    Fletcher International, Inc. ("**F-FII**") is a Delaware corporation managed out of San

10  Francisco, California with an office in New York, New York.

11       9.    Citco Group Ltd., ("**C-Group**") is believed to be an entity organized in Monaco and based

12  in Monte Carlo, Monaco.

13       10.   Citco Trading, Inc., ("**Citco**") is believed to be an entity organized in Monaco and based

14  in Monte Carlo, Monaco.

15       11.   Citco Trustees (Cayman) Ltd, CFS Company Ltd., CFS Corporation Ltd., CTC

16  Corporation, Ltd. (collectively, "**Citco Directors**") are all believed to be based out of the Cayman

17  Islands.

18       12.   Solon Group, Inc. ("**SG**") is a New York, New York corporation with an office in Walnut

19  Creek, California.

20       13.   Citco Global Custody (N.A.) ("**C-Ctd**") is believed a company formed in the Netherlands

21  Antilles. Walkers (BVI) is believed a company based out of the British Virgin Islands.

22       14.   Wilmington Trust National Association is believed a Delaware corporation.

23                                **Jurisdiction and Venue**

24       15.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§

25  1331 and 1337, §§ 10(b), 20(a), and 27 of the Exchange Act, 15 U.S.C. §§ 78aa, 78j and 78t(a), and Rule

26  10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as the common law, and

27  pursuant to the supplemental jurisdiction of this Court, 28 U.S.C. § 1367.

28

VERIFIED COMPLAINT - CASE NO. _____

16.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud and other wrongdoing and/or their effects occurred within this District, and many of the Defendants reside in and/or maintain principal executive offices in this District.

17.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the mail and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

### Gerti Muho, L-Hawk, and the Funds

18.     I/GM joined two Fletcher related entities one week after graduating from Berkeley law in May 2012. I/GM became Fletcher's second in command in mid-August, following an insider led attempt to takeover control of a FAM fund I/GM fought against for F-AF and FAM

19.     I/GM together with F-AF became sole directors of the Funds, the Fund Managers, and the Holding Co (indirectly) in mid-August and in September 2012, and I/GM soon learned HSBC Bank N.A. ("**HSBC**"), as the Funds custodian, had frozen the Funds assets. HSBC refused to release the assets until a new custodian was appointed and until an individual had claimed control over the Funds and had notified the Funds investors about his responsability. I/GM began seeking a new custodian immediately and filed papers with the Internal Revenue Service claiming control of the Funds.

20.     My/GM's efforts were frustrated by (i) the Funds not having had an audit for three-to-four years, and (ii) the Funds facing large redemptions from investors and that the Funds were holding commingled assets that were hard to value without a fundamental restructuring.

21.     Wilmington Trust, National Association ("**WTNA**") agreed to serve as custodian for the Funds in November 2012, or two months after I/GM began searching for HSBC's replacement. I/GM signed multiple agreements with WTNS. HSBC, however, refused to transfer assets to WTNA until January 14, 2013, requiring additional assurances that I/GM and WTNA assumed responsibility over the Funds assets. I/GM signed and e-mailed letters to investors and I/GM signed agreements letting HSBC off for liability they had incurred. I/GM executed all significant agreements between the Funds and the Funds providers during this time.

22.    F-AF in February began using the Funds assets for personal use. Primarily, F-AF ordered that $4,000,000 be sent to F-FII and about $3,000,000 be sent to legal service providers who I/GM learned were primarily representing F-AF and his interests, some of which conflicted with the Funds interests.

23.    In late April after F-AF refused to register the Funds with the Securities and Exchange Commission ("**SEC**") even after I/GM informed F-AF of the Funds need to register with the SEC, as the Funds operated exclusively in the U.S. and had assets in excess of $100,000,000.

24.    I/GM at the same time also learned that F-AF had cancelled the entity that had purchased from Citco shares of the Holding Co. purportedly for a $27,000,000 tax write-off. I/GM then also realized that FAM and Citco likely had misused the Funds assets to their own advantage, and that control over the Funds was most significant for it allowed control of past information about the Funds assets. I/GM was advised by FAM's counsel that I/GM needed to report the $4,000,000 transaction above to the SEC and that WTNA was very likely liable for allowing the payments.

25.    I/GM informed FAM's counsel that I/GM for months had worked on a plan to sell control over the Fund's management to a new entity staffed with independent directors whose primary responsibility would be to investigate past misuse by FAM and Citco, who would also appoint an investment advisor who would comply with SEC rules.

26.    I/GM created L-Hawk Monday, April 29, 2013 and completed corporate document required to transfer to L-Hawk management rights over the Funds and the Fund Managers. L-Hawk would conduct an efficient investigation into past abuses also and would seek efficient legal and out of court actions to recover the $7,000,000 known misspent funds plus other misspent funds. L-Hawk agreed to fund the investigation and the recovery efforts from $5,000,000 it raised from the Funds by selling the Funds preferred stock. I/GM also agreed to serve as the Funds investment advisor.

27.    Since April 29, 2013, I/GM registered L-Hawk's transfer agreement with the Funds with the SEC, and I/GM also registered as the Funds investment advisor, registering the Funds with the SEC for the first time. I/GM has also provided assistance to a number of government agencies interested in the matter. In addition I/GM investigated past misuses of the Funds assets, which led me/GM to bring the

current action. FAM, F-AF, and SG have used a dozen law firms I/GM paid with the Funds assets to fight me/GM and L-Hawk outside of court over the April 29 transaction. WTNA, whom I informed April 30, 2013 of their failures in law, has refused to pay L-Hawk's proceeds from the sale of preferred stock L-Hawk fully issued the Funds April 29, 2013. WTNA also refused to pay my/GMs management fees, ensuring I/GM funded all above listed actions personally, incurring significant personal debt. WTNA filed an interpleader action in Delaware court; WTNA naed L-Hawk, not me/GM/GMCM as parties after WTNA learned L-Hawk did not have an attorney and could not hire an attorney, as I/GM had run out of money I could even borrow.

28.     So my/GM's efforts have been frustrated by FAM, F-AF, and SG, and by WTNA. But FAM's and F-AF's efforts to frustrate L-Hawk and my/GM efforts served as proof that an investigation into the past acts was needed, strengthening my/GM's resolve in carrying out my/GM's obligations to the Funds and their investors.

29.     F-AF owns all shares of FAM's equity. F-AF now or in the past has owned Fletcher Global Management, LLC, a limited liability company that advised G-Hawk and related entities, that unlike FAM is not registered with the SEC.

30.

31.     F-AF and a Citco executive based outside the United States talked about daily for hours on the phone in the mid to late 1990's. F-AF and the Citco executive discussed how Citco could pump up FAM's feeder funds. Additionally the FAM executive and the Citco executive discussed how the Citco could cause the Funds to invest in FAM's feeder funds and how Citco and FAM could issue notes to financial institutions using SPVs.

### Facts Primarily Related to F-AF, FAM, F-FII, and G-Hawk Defendents

32.     Based on conversations between F-AF and Citco listed here and others F-AF and Citco organized SPVs that in 1997 issued notes in exchange for cash. F-AF and Citco led the SPVs to invest directly or indirectly in feeder funds that invested in other feeder funds FAM managed and Citco administered.

33.     Jersey (Corsair) an SPV issued another $100,000,000 in notes in 2004 and used the

7

VERIFIED COMPLAINT - CASE NO. _____

proceeds to invest in FAM managed feeder funds that invested in other FAM managed feeder funds that invested, ultimately in FAM managed master funds. Citco administered all funds FAM managed.

34.    RBS in 2006 bought another similar issuance of notes and the Funds repaid RBS by purchasing $140,000,000 in assets through G-Hawk.

35.    FAM purchased management of the Funds in 2007 and cancelled its interest in the Funds for a tax write-off in 2010. FAM kept existing management from Citco in charge of the Funds management, and only removed them after Citco insisted FAM pay it a fee of about 1% of the assets G-Hawk purchased that FAM did not wish to pay to Citco.

36.    FAM informed Citco that its fee was not part of any written agreement. FAM only changed its position after Citco through Citco Directors refused to use the Funds assets to purchase assets of G-Hawk necessary to repay RBS.

37.    RBS offered to accept a settlement of 80% of the amounts owed it indirectly by FAM and Citco. FAM however refused to provide RBS with details about the notes proceeds. FAM was aware of the LTV ratio forbidding overexposure of the notes proceeds and over-exposure of collateral RBS held. FAM was aware that the LTV ratio was breached by over-exposure to FAM managed feeder funds. FAM's awareness of the above caused FAM to decline to provide RBS with information about G-Hawk's investments that RBS requested. FAM's awareness of the above caused FAM to pay RBS all of the notes principal and interest, so as to avoid disclosing to RBS that FAM had caused with Citco's aid a breach of G-Hawk's agreement with RBS.

38.    FAM could exercise control over the Funds and the Funds managers in 2008 after it paid Citco $27,000,000. FAM exercised that control indirectly through untraceable methods of communications, and documented its control by writing e-mails that showed to the Funds executives someone had requested their actions, but not disclosing the requesting persons identity. The Citco executives required the e-mails to escape liability but did not persisted in explicit details because they were aware of the ultimate identities and were aware that FAM disclaimed control over the Funds. Even while exercising control of the Funds, FAM did not list the Funds with the SEC, despite its control over the Funds, which together held over $1,000,000,000 ($1 Billion) in assets when FAM took control.

39.     FAM directed the Funds investments in feeder funds FAM managed after taking control of the Funds. FAM was aware of the Funds offering memorandum pursuant to which the Funds investments were to be made. FAM was aware that the Funds investments in FAM feeder funds were not allowed by the Funds offering memorandum. FAM was a fiduciary of the Funds it managed and a fiduciary of the Funds investors. FAM represented itself to the Funds and the Funds investors (in the very few communications FAM had with the Funds) as an experienced Advisor who would not allow conflicts of interest to cause the Funds and the Funds investors' harm.

40.     FAM did not register the Funds with the SEC even after FAM executives replaced Citco executives and directly managed the Funds from FAM New York office. FAM was aware that the SEC required Funds FAM controlled to register with the SEC. FAM was aware that the SEC would require details from FAM about transactions between the Funds and G-Hawk, and the Funds and FAM managed feeder funds.

41.     FAM was also aware that FAM controlled funds needed to keep copies of books and records. FAM disputed factual assertions by employees about FAM's control over the Funds that, if true, required FAM to keep records of transactions and communications about the Funds it then controlled. FAM disputed facts that showed FAM controlled the Funds and the managers. \

### Facts Primarily Related to the Citco Defendants
### (Citco, C-Group, G-Hawk, Citco Directors, C-Ctd)

42.     Citco created the Funds starting in 1993 to be managed accounts; managed by different investment managers who Citco controlled through a holding company that owned each manager and could appoint or dispose of a Fund Manager's management at will (See Ex. Fig. 2, below). The Fund Manager in turn could appoint or dispose of the Funds' management at will.



Figure 2: A Simplified Representation of the Funds Structure

VERIFIED COMPLAINT - CASE NO. _____

43.     The Funds were structured and funded so as to avoid overbearing regulations and so as to avoid harming Citco's primary trade as custodian to over a trillion dollars in private fund assets.

44.     Citco did not invest its own money in the Funds, and the Fund Managers caused the Funds to issue to private outside investors non-voting shares in exchange for money the Fund managers claimed they would invest as fiduciaries of the Funds and the Funds investors in diversified portfolios of assets holding private funds.

45.     Citco gave FAM, indirectly, 85% of the Holding Co holder of the Fund Managers in 2008 and at the same time FAM gave Citco $27,000,000 in cash. Citco remained 15% holder of the Holding Co and its employees and executives remained with the Holding Co and with Funds and Fund Managers after the sale. Citco employees and executives only left in mid 2009 from their positions with the Holding Co, with the Fund Managers, and with the Funds.

46.     Citco agreed to invest the Funds assets in FAM funds that were part of the master-feeder funds that FAM and FAM related entities managed, and FAM paid Citco an unwritten but agreed upon cut of the fees FAM charged to the Funds money once in the FAM structure that neither Citco, nor FAM, nor Citco as custodian disclosed to the Funds and to the Funds investors.

47.     Citco served as custodian and administrator for the Funds and provided the Funds and the Funds investors with investor accounts statement and additional information related to the Funds investments.

48.     Citco as custodian omitted information to the Funds and the Funds investors about the Funds excessive exposure to FAM managed funds; and Citco as manager and as custodian not disclose to the Funds and to the Funds investors that the Funds investments in G-Hawk were used to invest in Hawkeye Finance Corporation, Hawks-Bill Holdings Limited, Hawks Nest Overseas Corporation, Principal Protected FIA I Fund Ltd., and Principal Protected FIA II Fund Ltd.

49.     Citco could and did control the management of the Funds and the management of the Fund Managers, and did lead the Funds to purchase G-Hawk assets and FIA Leveraged (Cayman) assets.

50.     Citco knew that FIA Leveraged had issued to three Louisiana pension funds debt-like shares that were senior in priority to the Funds investments in FIA Leveraged, and senior in priority to

VERIFIED COMPLAINT - CASE NO. _____

the investments the Funds made in G-Hawk. Citco as custodian omitted information to the Funds and to the Funds investors that would have informed them of the excessive junior exposure of the Funds in the FAM structure, and Citco as custodian failed to block the Funds assets from being invested in brazen violations of the offering memorandum pursuant to which the Funds investments were to be made.

51. Citco received 50 basis points for every dollar under FAM's management that Citco helped bring into FAM's structure.

52. Citco could block and did block the Funds and G-Hawk from purchasing the assets Citco knew were worthless from mid 2009 until mid 2010, but only after FAM refused to pay Citco its customary, unwritten but agreed upon fee in connection with Funds purchase of G-Hawk's worthless assets; and Citco continued to block the redemption of RBS's notes until Citco forced FAM to change position on the unwritten but agreed upon fee Citco was owed for helping bring the Funds money into the FAM structure.

53. Citco's fee represented only about 1% of the assets the Funds purchased through G-Hawk after FAM changed its position on Citco's fee; Citco caused a one year delay for one percentage point but no delay once it was paid in wasting 100 times as much in the Funds assets. Citco's employees left managing positions with the Funds and the Funds Managers after its dispute with FAM over its unwritten but agreed on fee.

54. Citco controlled G-Hawk at the time the Funds purchased through G-Hawk $140,000,000 in worthless assets.

### Facts Primarily Related to F-AF, FAM, F-FII, SG, and WTNA Defendants, for Events Occurring during late 2012 – 2013

55. F-AF and I/GM sold over three hours between Dec. 31, 2012-Jan. 1, 2013 all of F-FII's interest in BRG Investments, LLC, and all of F-FII's interest in Fletcher International, Ltd., managed by a court appointed Trustee, to a Fund for $5,400,000.

56. F-AF sold the Trustee of Fletcher International Ltd. BRG Investments LLC and other property of F-FII in February 2013.

57. F-AF requested indirectly at first through phone calls made by another FAM executive,

11

and directly later that I/GM pay to F-FII what the Fund owed to F-FII for the Funds purchase from F-FII of property F-AF re-sold in February to the Trustee.

58.     F-AF also requested I/GM pay about $3,000,000 to law firms and other service providers from the Funds accounts for services that F-AF and FAM had made side agreements with the law firms and the other services providers for F-AF and FAM to receive and not for the Funds to receive.

59.     F-AF sent an e-mail in the form of Figure 3, below, after a certain service provider recused from his position with FAM. I/GM later informed F-AF and FAM that the service provider recused after a conversation I/GM had with the service provider, and that I/GM had informed the service provider that L-Hawk's merger with the Funds had been completed prior to the service providers recusal e-mail that prompted the e-mail in Figure 3.

Figure 3:



60.     I/GM informed WTNA April 30, 2013 that I/GM would no longer allow the Funds assets to remain with WTNA as WTNA was holding the Funds assets in violation of SEC rules and regulations.

61.     I/GM informed WTNA April 30, 2013 that I/GM planned to immediately begin registration of the Funds with the SEC. Additionally I/GM informed WTNA that they had been illegally taking orders from FAM about distributions out of the Funds assets that had been used by FAM for its benefit and not for the Funds benefit.

62.     Deborah H. Midanek called me/GM June 28, 2013 on behalf of SG and told me that she too believed AF's conduct disqualifies him from holding any position of trust over the Funds. She informed me that SG had removed F-AF from control of the Funds on June 17, 2013 but only from the

Funds formed in the British Virgin Islands (BVI).

63.     I informed her that GM had removed both SG and F-AF April 29, 2013 but that he courage in removing F-AF was appreciated.

64.     SG then requested that I give to her shares that would allow control over the Funds formed in the BVI. And SG also stated that those Funds have about $25,000,000 in assets.

65.     This plus SG's lack of documentation plus SG's recent shift in the story above, led me/GM to conclude that SG and F-AF and FAM had contrived to split management over the Funds so as to cause each F-AF, SG, and other Doe(s) to manage assets under $25,000,000.

**66.**     SEC registration is not required for investment managers that manage less than $25,000,000.

**Count I: Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
(Brought Against the F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk)**

67.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.     During the period which defendants jointly controlled the Funds, defendants: (i) carried out a scheme, plan and course of conduct, in connection with the purchase and sale of securities, that was intended to and, through the period which defendant jointly controlled the Funds now controlled by assignee L-Hawk, did deceive the Funds and the Funds investors; (ii) made various deceptive and untrue statements of material fact, necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Funds and the Funds investors; and (iii) engaged in acts, practices, or a course of business which operated as a fraud or deceit upon the Funds and the Funds investors.

69.     Defendants, pursuant to said scheme, knowingly and recklessly engaged in employing the following deceptive devices and contrivances:

a.  Materially false and misleading Offering Memoranda and Discretionary Investment Management Agreements designed to market and promote to the Funds and to the Funds investors Citco, Citco Directors, and FAM using materially false and misleading

13

statements concerning defendants investment strategies and the level of supervision to be exercised over outside Investment Managers.

    b.  Fraudulently certified audit reports, and account statements, that created a false impression of the Funds financial condition to the Funds and to the Funds investors.

70.    In particular, the scheme, plan and course of conduct, acts, practices and course of business unfolded as follows:

71.    Defendants incurred obligations over the years to creditors for hundred of millions of dollars.

72.    Their own obligations led Defendants to cause the Funds to invest in various feeder funds that held little to no assets and that used the Funds money to meet other obligations Defendants had incurred over the years.

73.    Defendants conspired and together prevented disclosure to the Funds and the Funds investors of Defendants scheme, pursuant to which the Funds purchased $140,000,000 of worthless assets from G-Hawk.

74.    Defendants conspired and together prevented disclosure to the Funds and the Funds investors of Defendants scheme, pursuant to which the Funds purchased $60,000,000 of worthless assets from G-Hawk.

75.    By virtue of their culpable participation in the actions carried out by G-Hawk, and co-defendants, Citco, Citco Directors, C-Cstd., C-Group, G-Hawk, F-AF, and FAM are liable pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder. As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages of $200,000,000 or more in connection with their investment in the Funds.

76.    Plaintiff is entitled to recover $200,000,000 or more from defendants Citco, Citco Directors, C-Cstd., C-Group, G-Hawk, F-AF, and FAM, all of whom are liable jointly for the damages they together caused Plaintiff.

**COUNT II: Violation of Section 20(a) of the Exchange Act**
**(Brought Against Citco, Citco Directors, F-AF, and FAM)**

14

77. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

78. Citco, Citco Directors, F-AF, and FAM acted as controlling persons of Funds within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high level positions, participation in and/or awareness of the Funds operations, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Funds management, and of G-Hawk including the content and dissemination of the various statements alleged herein as false and misleading, and participation in the scheme and course of conduct alleged herein.

79. Citco, Citco Directors, F-AF, and FAM had direct and supervisory involvement in the day-to-day operations of the Funds and, therefore, had the power to control or influence the particular allegedly false and misleading statements or cause the statements to be corrected, and had the ability to halt the scheme or course of conduct.

80. Citco, Citco Directors, F-AF, and FAM oversaw the Discretionary Investment Management Agreements and Offering Memoranda that various Fund investors executed with the Funds and with the Fund Managers, within which there were repeated misrepresentations of the Funds investment strategies to investors. Pursuant to the Discretionary Investment Management Agreements between the Fund Managers and the Funds, and pursuant to the Offering Memoranda for the Funds investors, Citco, Citco Directors, F-AF, and FAM by way of the Fund Managers agreed to supervise and direct the Funds investments for the Funds investors. However, Citco, Citco Directors, F-AF, and FAM knew that a portion of these assets would be invested with G-Hawk and other Fletcher feeder funds, and thus, could not be supervised and directed for the Funds benefits and for the Funds investors benefit as stated in the investment management agreements and offering materials.

81. By virtue of their positions as controlling persons, as well as their culpable participation in the actions carried out by G-Hawk, defendants Citco, Citco Directors, F-AF, and FAM are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of their wrongful conduct, Plaintiff suffered damages of $200,000,000 or more in connection with their investment in the Funds.

**COUNT III: Unjust Enrichment**

15

**(Brought Against F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk)**

82.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.     As a result of the misconduct detailed herein, Plaintiffs' assets and Plaintiff investors' assets have been decimated; yet F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk have reaped substantial fees, dividends, and other pecuniary benefits at the expense of Plaintiffs and of Plaintiff's investors.

84.     F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk have therefore been unjustly enriched, and equity and good conscience require that these Defendants disgorge to Plaintiffs and members of each Class all such unjust enrichment in an amount to be determined at trial. As a proximate result of the F-AF, FAM, Citco, C-Group, C-Directors, C-Cstd., and G-Hawk breaches of their duties and contractual obligations, Plaintiffs and Plaintiff's investors have sustained damages and lost a substantial part of their respective investments in an amount to be proven at trial.

**COUNT IV: For Rescission of Fees Under the Investment Advisers Act (Brought Against FAM, Citco)**

85.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     Citco and FAM acted as "Investment Advisers" to the Funds and had discretionary authority over the Funds assets.

87.     FAM is a SEC registered investment adviser.

88.     Citco acted in all respects as an investment adviser.

89.     As Investment Advisers FAM and Citco owed the Funds certain obligations.

90.     Specifically, FAM and Citco could not engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client. FAM and Citco breached their duties to the Funds members by engaging in a course of conduct, which operated as a fraud or deceit on the Funds.

91.     FAM and Citco failed to disclose that they had incurred obligations in the past to creditors

16

and that the Funds assets would be used to repay those obligations.

92.    Such information was material to the Plaintiff and to Plaintiff's investors who would not have allowed FAM and Citco to manage the Funds had FAM and Citco made this information known to them.

93.    FAM and Citco was unjustly enriched by the investment management fees and the administrative that they shared with each other in exchange for investing the Funds assets in feeder funds whose assets they had exhausted over the years.

94.    As a result, Plaintiff is entitled to rescission of their investment adviser contracts and agreements with FAM and Citco and to recover, from FAM and Citco, all fees and commissions paid in connection with Plaintiff's and each Class members' investments.

**COUNT V: For Rescission of Contracts Under CA Code §§ 1667 and 1668**
**(Brought Against all Defendants)**

95.    Defendants contrived together to operated a scheme that served to defraud Plaintiff of over $207,000,000 in known damages over the years.

96.    Defendants scheme operated by exploiting the laws of the United States and of the State of California that required defendants to register all transactions and all self-interested transactions, and Defendants have continued to violate the same laws to prevent detection of their past acts and accountability of their past acts.

97.    Plaintiff is entitled to rescind all contracts and agreements with Defendants, all of which violate the laws of the United States and the laws of the State of California.

**COUNT VI: For Payment of $5,000,000 to L-Hawk in Connection with L-Hawk's Sale to the**
**Funds of Preferred Shares**

98.    L-Hawk has issued preferred shares to the Funds.

99.    L-Hawk issued the preferred shares pursuant to an agreement all parties executed by their authorized representatives.

100.   L-Hawk has taken all acts needed to entitle it to payment for the shares sold and has

17
VERIFIED COMPLAINT - CASE NO. _____

instructed WTNA for payment.

101.    WTNA has refused to tender payment to L-Hawk

102.    L-Hawk is entitled to enforce WTNA to pay to L-Hawk the Funds obligations, or $5,000,000

**JURY TRIAL DEMANDED**

103.    Plaintiff hereby demands a trial by jury.

Dated: July 25, 2013

Leveraged Hawk, Inc. c/o Gerti Muho Capital Management, Pro se.

_____
Gerti Muho
Plaintiff, pro se.

Sworn to before me this Thursday, July 25, 2013

_see attached_    _RCC_

VERIFIED COMPLAINT - CASE NO. _____

Court Complaint
Plaintiff, Gerti Muho

California Notary Jurat

State of California

County of _San Francisco_

Subscribed and sworn to (or affirmed) before me on this _25th_

day of _July_ , 20 _13_ ,

by_____Gerti Muho_____,
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.



RUSSELL CHUAN CHANG
Commission # 2012811
Notary Public - California
San Francisco County
My Comm. Expires May 17, 2017

(Seal) Signature_____